Gentlemen, we have four cases on the calendar this morning and surprise, surprise, no patent cases. Two cases from the Court of International Trade which are related and two cases from the Merit Systems Protection Board, one of which is being submitted in the briefs and will therefore not be argued. The first case is Diamond Sawblades v. United States, et al. 2016, 1253. Mr. Neely. Good morning, may it please the Court, I'm Jeffrey Neely of Hush Blackwell and I'm here today on behalf of the CNM entity. I'd like to begin by making clear what this appeal is about and what it's not about. The government has set up some straw men and knocked them down, but it has stated the obvious about some past cases under different facts, but we do not think that it has addressed the facts in law with regard to this case. The question here is what happens when the entity has cooperated in the review, where commerce has made an explicit finding that there is no failure to cooperate, not only by that entity, but by any member of the PRC-wide entity. Let me ask you a question. You said there's only one entity. Commerce did talk about a collective entity, but it referred to 21 other organizations. Are you saying those organizations don't exist anymore? No, I'm not saying that at all. Are you saying that the one entity is the ATM entity? The entity that we're analyzing is the PRC-wide entity, I think quite clearly. We think this is clear. I think we're actually in agreement with the government. The question is what rate applies to the PRC-wide entity. You're not arguing as do some of the amici that they can't use a PRC-wide entity, right? No, we don't think you need to reach that in this case. Okay. The reason I say that there's one entity is I'm saying in this particular case, on the facts of this particular record, of this particular case, the ATM entity and the PRC-wide entity are one and the same. Let me tell you why I think that. That goes to your argument where you say they can't incorporate their findings from the prior investigation? Yes. It's related to that, but it goes more directly, first of all, to the issue of the 21 companies. I think that looking at the record is probably the best way to approach this.  I think so. If we take a look at our section A response, which is of May 10th, 2001, of Gung Yong and the ATM entity, which is the joint appendix at 170 to 171. In response to question two of that questionnaire, my client provided information on who it's related to and who it's not. On page A4 of that response, at Roman small four, we explicitly stated, quote, there is no relationship with any other exporter or producer and there is no sharing of managers or owners, end of quote. This statement is undisputed on the record. I'm really quite confused about what point you're making, which I think Judge O'Malley was getting at too. In this case, we can ignore the 21. We can ignore, I don't know how many else might have been part of the PRC entity. Are you saying because ATM is organizationally actually related to everything in the PRC entity? No, what I'm saying is that there's only one producer. We're talking about the diamond saw blades industry after all. That's the PRC-led entity we're talking about. There's only one producer of diamond saw blades that is owned or controlled by the government of China and that is the ATM entity. That's what we said on the record. Is that what you were just... That's what I was just referring to, Your Honor. So where does it say no government-controlled producer of this product except ATM? Well, what we say is that we're not related to any other producer or exporter, which means the same thing. I'm sorry. I thought the position you took is that you weren't government-controlled. Well, initially we did. We agreed that we did not believe that we were government-controlled. Court of International Trade disagreed with that. This court affirmed it. So that issue is off the table. But isn't that... I mean, you're missing, I think, the point. You don't have to be related at this level to be related in this umbrella, right? In other words, once you're government-controlled, then everyone else that's government-controlled is related by definition, correct? Yes, but that's the point of what we said here. There's nobody else that's related to us. There are no other diamond saw blade companies in China that are related to our companies. Are related to what? To the government? To the ATM entity. But once you're related to the government, the question is whether the other diamond saw blade companies are also related to the government, correct? We've said that we are not related to anybody else. And if it were the case, Your Honor, if it were the case that there were other diamond saw blade companies out there that were related to the government, that would be a false statement, okay? Because we would be related to them. We said we were not, and that has not been disputed. But you're saying you disagree with Commerce's conclusion that you were government-controlled. No. No, I mean, that's passed. That's over. That issue has been resolved. We're not disputing that whatsoever. I think that the government would like us to be re-litigating that case, but we're not re-litigating that case. We're saying, okay, we're government-controlled. That's fine. Now that we're government-controlled, let's look at the relationship of our company to other companies that might be government-controlled. Fair enough. We're fine. You know, we litigated that case. We lost it. Now we're here and we're saying, let's take a look at who we're related to. The record says we're not related to anybody else. And anybody else means owned by the government or not owned by the government. It means anybody. When you submitted the document that you were reading from, were you contending that you were not government-controlled at the time you submitted that document? We were not contending it, but it doesn't really matter. Not related is not related. That's all. That's what I'm saying. Here's what I find, I guess, surprising. I had taken it that this document says you're not related to any other producer of diamond saw blades. In the ordinary sense, that didn't mean that, and the government does not have to conclude, it does mean that there are no other government-controlled diamond saw blades producers in China. Just because time is short. Can you proceed, at least, to address whether you have an argument on the assumption that there are, in fact, other, like 21 other, producers of diamond saw blades, government-controlled, it turns out, that are not... I think there were other errors. That is one error. I thought that the gist of your argument, in part because I was putting aside the other thing, was that the rate that you were given here is based, in part, on an adverse inference based on conduct not within the first administrative review period. And that's impermissible. Absolutely. That's one of our arguments. I think there are a number of errors here. One of our arguments is that, and this goes to the Abomrah case, where this court said recently, as I'm sure you're well aware, that you can't bring in information from outside that's non-record evidence. And that's what they've done here, among other things. They took evidence that was on the record of this case, which was the 0.15%, and the 164%, which was an adverse rate, and combined them to come up with this 80-some percent rate, 82% rate. So that, we believe, is erroneous also, based on that recent case. If the 164% were appropriately considered, so say we reached the conclusion that because it was at an earlier part in the investigation, that Congress could appropriately consider it, is there anything about the methodology, about the averaging, that you object to? Well, it's a simple average, Your Honor. It's one, two numbers divided by two. So in that sense, there's no methodological problem. You just think it's the 0.15 rate is where we should be? Well, we think that for a number of reasons, but one is that the 164% rate is not on the record. We had no ability to challenge whether that rate is an appropriate rate here, on the record of this case, which is, you know, we believe to be contrary to law, as we set out in our brief. So yes, we think there's a huge problem with that number. Well, you knew that's the number they had come up with the first time around, right? The first time around, meaning? In the original investigation, that was the PRC entity rate. Well, in the original part of the investigation, we didn't care because we were found to be entitled to a separate rate. So we certainly didn't challenge it, no. I mean, that was a completely different world. That was using the old methodology that Commerce was using, and they said, you're entitled to a separate rate, so we certainly... But when it became clear that Commerce believed that you hadn't established that you were sufficiently independent from the PRC-wide entity, didn't you at least have noticed that you were being threatened with this 164? I mean, that's where you could have ended up. Oh, yeah, we absolutely were aware, and we challenged it. I mean, that was what happened during the remand before the Commerce Department. But I thought you just said to me you didn't have any opportunity to challenge it. No, no, we didn't have any... We objected on legal grounds to the 164%. We didn't have an opportunity to go behind it and find out how it was calculated to see if that could have been a sensible rate. And remember, Your Honour, that the Commerce Department... Did you ask for that opportunity? I mean, you had a remand. Yeah, yeah. I mean, we commented to Commerce and said that it's inappropriate, and one of the reasons was that it wasn't on the record. Yes. But you said you didn't have a reason to challenge it because you had a separate rate. No, no. I'm talking about in the original... We're confusing two things here, I believe, Your Honour. When we had no reason to challenge it, I'm talking about in the original investigation, which I believe was what the question was. What I'm talking about, about our challenging it, was in the remand to the Court of International Trade more recently, of which this is part of the appeal. Right. So when you had a remand, you didn't ask to, as you say, go behind it and challenge the merits of that 164 determination? We said it wasn't on the record. So, yes, we did challenge it. Well, you challenged the fact that it wasn't on the record. Did you challenge the substantive conclusion of 164? It wasn't on the record, so we didn't have any basis to say anything about it. I mean, how could we challenge it if it's not on the record? In the first administrative review, it was from the beginning an issue whether you were going to stay separate or were going to be put into the PRC entity, right? Because you have to justify your continuing independence. What did you think was going to happen if you lost on that? If we lost on what, Your Honor? On whether you were independent or not. We thought that they should then look at the facts before the court. They were totally separate issues. Our client chose not to address and to raise the issue of the 164% or whatever rate was applicable in the appeal earlier. There was no reason to do that. This was the first time. In this case, it's the first time that this came up. And what we thought would happen is actually that the Commerce Department would follow the law, which is to look at the record, to take a look at what rate applies to the PRC-wide entity. And in fact, what happened was that the Commerce Department explicitly said in this first review that there's been no failure to cooperate by the PRC-wide entity, yet they used an EFA rate. On that point, can I ask you about something that you explicitly say in your brief? Sure. You say that Commerce found that the 21 companies were part of the PRC-wide entity in the preliminary results of this review only based on their failure to cooperate. So why is that not? I haven't actually found the record support for that, but you say it in your brief. Why is that not sufficient to allow them, Commerce, to invoke 1677EB, namely to draw an adverse inference because parts of the PRC entity failed to cooperate, not before, but now? No lack of contemporaneousness problem, those 21. Well, the 21 companies failed to respond to the initial part. Is that a failure to cooperate that triggers the adverse inference B provision? Yes, at that time, but here's what I think we need to take into account. This court, in the Rutan case, talked about how presumptions work. And what they said was this, quote, a presumption completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact. That evidence that we're talking about is the evidence that we've, a moment ago, from the May 1st, where we said we're the only company in China that makes diamond saw blades. And we raised that with Commerce back in the initial part. We raised it again. In this case, we've raised it time and again, raised it with the court below. So you're saying the other 21 companies don't exist anymore? No. I'm not understanding this. Well, I'll tell you, what I'm saying is this. The 21 companies exist. They're not related to us. Forget about relatedness. Are there 21 other companies that exist, that are involved in the diamond saw blade business? There are 21 other companies that exist, and we have no earthly idea, because the record doesn't show it, whether they're involved in the diamond saw blades industry or not. Okay, so your statement that you're the only one, you have no idea whether that's true or not. You're saying we're supposed to be bound by that, that that's supposed to do away with the presumption, and yet you admit that you don't even know if that's true. No, I'm not admitting that. Because I don't think, we are the only diamond saw blades company that is owned or controlled by the Chinese government. Mr. Neely, you've consumed your time, but we'll give you three minutes of rebuttal back. I'm sorry? We'll give you three minutes of rebuttal back. Okay, great. Thank you very much. Mr. Toter. May it please the Court. With respect to the question of whether there's any planning as to whether these 21 companies still exist or not, we direct the Court's attention to page 27 and page 138 of the joint appendix, which was, they seem to be copies of the same remand redetermination from Commerce, and Commerce makes reference to the 21 companies still existing, and ATM now being the 22nd company. There was not a reinvestigation of the scope of the industry in this review. There were not additional questionnaires sent out to these 21 companies, again, seeking to determine their commercial activities. Instead, Commerce selected two mandatory respondents, one was ATM, one was the Way High Company, which is a party in the 1254 case. Can I just focus on this? Mr. Neely, in his brief, said at page 40, and counterpart in the second case we're about to hear, that the 21 companies were stripped of their separate rate status and put into the PRC entity because of a failure to cooperate. Is that true? What's the documentary support of it? Because that might be relevant to whether you can invoke, if you need to invoke, 1677EB. Our understanding is, and Commerce says this at page 27 of the joint appendix, that the PRC entity is subject to review in the underlying proceeding because of the companies on which the review is initiated. 21 companies failed to demonstrate a lack of de jure and de facto control, and therefore did not receive a separate rate. That was part of the investigation. Just to be clear, it is in my mind, and tell me if this is wrong, a different thing to say they failed to cooperate from saying, they failed to show that they were independent to the Chinese government. The second would not trigger all by itself the adverse inference provision. The first would. My understanding is there was a failure to cooperate in the investigation. Your understanding. So what in the record would say that? The record of this review is on the record of the investigation. I'm just reeling my understanding of what was in the investigation. What was carried over from the investigation was the PRC wide rate, which was from the Federal Register of Notice. It was not an independent reinvestigation of the investigation as part of the record of this review. So right now you're not aware of any failure to cooperate by the 21 companies in the first administrative review? No, and they weren't asked to cooperate. They weren't asked questions by Commerce in this review. This is so important. I'm going to just keep asking until I'm absolutely sure what I can rely on. What he says on page 40 of his brief, you're saying is false. And that's a really good thing for him, that it's false. What was the statement on page 40? That there were 21 companies, part of the PRC entity, that failed to cooperate in this administrative review. In the investigation, there was failure to cooperate. There was the adverse inference rate. There was not a separate investigation by Commerce. They didn't send questionnaires to these companies. Those companies chose not to respond to as part of this review. In terms of their legal argument that this means that there was a failure to cooperate on the record of this review under 1677E, we just want to make clear, we don't think that's a requirement for Commerce to carry forward the rate from the investigation forward. I think I understand. Your argument is never mind 1677EB. I'm not sure I buy that. But it's a substantially more difficult question, it seems to me, than if you could say there was, as he says on page 40, a failure to cooperate of pieces of the PRC entity in this review, then you could rely on 1677EB. We are not relying on 1677EB because there weren't questionnaires sent to those companies that those companies failed to respond to in this review. It happened in the investigation, not here. As I understand, I'm looking at the pages that you cited us to, which the language is identical. It says the PRC-wide entity is subject to review in the underlying proceeding because of the companies on which the review was initiated. 21 companies failed to demonstrate a lack of de jure and de facto control. And therefore, did not receive a separate rate, right? Yes. And you're saying that that failure to establish a right to a separate rate was in the earlier investigation. Yes. And then you say the ATM entity is now the 22nd company found not to be entitled to a separate rate and joins the other companies in the PRC-wide entity under review. Yes. And so you're saying that to the extent there was, for whatever reason, whether it was lack of cooperation or not, they were never entitled to a separate rate. Right. And... Initially, Congress had found ATM was. Then after litigation, eventually reached to this court, ATM was not eligible for a separate rate. So now ATM is also part of the PRC-wide entity. Can you respond to the argument that there is no evidence that those other companies actually engage in diamond saw blade production or activity? There's... That's a pretty bold statement. And there's no evidence on this record that would support that presumption. There were not questionnaires sent back to these companies to follow up, hey, tell us how much you're selling during this period, so we can make a weighted average comparison or something like that. That didn't happen. They did not reinvestigate those companies. They carried over the rate from the investigation. So we do not have data on this record of how many shipments that these companies were making during this period because that wasn't reinvestigated. Once ATM submits a document that says, we're the only entity in China that is controlled by the government and that is involved in the diamond saw blade business, whether that's completely false or not, but once they make that statement, what's Commerce's obligation in response? Commerce can choose to investigate what companies it chooses to investigate. In this case, they investigated two companies, ATM and Weihai, and they can choose their respondents. They don't have to send out questionnaires to reinvestigate all of the commercial data for the entire People's Republic of China every year. They don't have to do that. So they're within their discretion to choose to reinvestigate these two companies. When they got the information they got from ATM, and they ultimately were determined to be part of the PRC-wide entity, Commerce chose to incorporate this knowledge because they initially had calculated a separate rate for them into their calculations of the PRC-wide entity and cut that rate in half. That was a benefit to ATM compared to what it would have been under the default rule in other cases, such as, I believe, line paper and off-the-road tires. So Commerce could have just stuck with the 164 rate. Under what regulations did they engage in the averaging? Or was it just a gift? The averaging was not the product of any regulation. 19 CFR 351.107 says that the rebuttable presumption is that you're part of the statewide entity until you prove otherwise. In cases such as line paper and off-the-road tires, Commerce has said, well, if you're part of the PRC-wide entity, your rate can be treated as irrelevant, and you just get the PRC-wide rate. In this case, Commerce, because they had gone through and calculated an individual rate for them, decided to incorporate that additional information and average it, but they were under no obligation to do so. There's no regulation that says, oh, yes, if a company that previously got a separate rate, all of a sudden, after litigation in the court, is determined to be part of the PRC-wide entity, you do an average. Or what kind of average? It doesn't say that. Commerce made a determination based upon this additional information they got about the PRC-wide entity, but they were not under an obligation to do so. With respect to the arguments... I believe ATM had said in their papers, you could have just asked us. We could have asked these other 21 companies what they were doing. We'd tell you if they were affiliated with us. Again, Commerce isn't obligated to reinvestigate every single company, and they're not obligated to take ATM's word for it as to what the 21 other companies are doing. Again, that is not an obligation that Commerce has as part of the review process. Also, given that it is the first review where they're actually fixing the actual cash deposit rate that's going to be used, it was a reasonable exercise of Commerce's discretion, given this individual situation where you had a company that had qualified for a separate rate and then lost it, to incorporate the commercial information about that entity into the PRC-wide rate, but as the Court of International Trade correctly held, Commerce wasn't under an obligation to do so, and its review of the PRC-wide rate under 1675A permitted it to do so under the facts of this review. Anything further, Mr. Toto? No, Your Honor. Well, I will hear from Mr. Pickard, who has two minutes. Good morning, Your Honors. This issue's been thoroughly briefed, so I think with the Court's permission, I would just offer one observation, and then obviously happy to answer any questions that you may have. The basic NME, non-market economy methodology, has been approved by this Court for 20 years. What I'd just like to do is take one minute to make an observation in regards to the very purpose of the methodology. Basically here, we know that there are at least 21 entities that have been found to be owned and controlled by the government of China. The purpose of creating a PRC entity-wide rate is to make sure that no entity that's controlled by the government of China ends up being essentially a tunnel for exports to the United States, so that there's no manipulation of the system, either by having one company have a particularly low rate so all the other companies funnel through them, or attempt to have just one of those entities participate to a limited degree, get a lower rate, and then have that apply to the entire PRC entity. That's the purpose behind it that's been upheld for 20 years. What the appellant is asking for in this case flies in the face of the very purpose of it, to create an opportunity for one company to potentially game the system, and then end up being an export or an avenue for other companies to either funnel their exports through, or their limited participation to bring the rate down for everyone. Just from a policy and a purpose perspective, what the appellant is asking for now would frustrate the very existence of this basic methodology. That being said, happy to answer any questions. Can you ask, and this is unbelievably record-specific, so if you look at either A27 or, the document is printed twice in this, A27, the sentence that says, the PRC-wide entity is subject to review in the underlying proceeding because of the companies on which the review was initiated, 21 companies, failed to demonstrate a lack of de jure and de facto control, and therefore did not receive a separate rate, and it cites the preliminary results, at 76137 to 138. I guess I'm having a little trouble understanding where on those pages in the preliminary results it indicates that there are 21 companies that failed to make the demonstration of independence from the Chinese government. Without having the pages directly in front of me, your honor. Is it wrong that there were companies other than ATM that were added to the PRC entity in the first administrative review? Or is ATM the only one? Everybody, I don't know, I read that sentence, I think I was told by the government, incorrectly read the sentence, to say that there were 21 added in the first administrative review, not in the original investigation, because that's why they were listed separately in the initiation of the review. To the best of my recollection, your honor, there were 21 companies that had, at a minimum, right, because obviously there are other companies in China that weren't identified. 21, and this is again to the best of my recollection, from the original investigation who had originally failed to rebut the presumption, and then as a result of litigation, Gang Yang was added into that, and the first administrative review, I believe we now have 22, including Gang Yang, and by the second administrative review, I believe the number grows to 27. Thank you, Mr. Picard. Mr. Neely has three minutes of rebuttal time, if he needs it. Thank you, your honor. Just a couple of points. First of all, let's make it very clear, we don't really care what happens to these 21 companies, they're not related to us, so in some sense we don't care. But I think what's very important to distinguish between the use of adverse inferences against those 21 companies for whatever failures they had, and an adverse inference against our client as part of the PRC-wide entity for anything that it failed to do, and they're quite distinct. I mean, you can punish the 21 companies, and we have no problem with that whatsoever, but we're being punished now for something that had nothing to do with us. But the government would argue that this has nothing to do with adverse inferences, this has to do with a conclusion that you were part of a PRC-wide entity that had previously had an established rate. They do argue that. The rate that they applied was 164.09%. That is precisely the rate, the one hundredth of a percent, to the rate that they said was an adverse rate in the original investigation that they pulled over to this first review. So I don't understand that. They took account of your cooperation through the averaging, correct? I'm sorry? They took account of your cooperation through the averaging. In other words, they said you have to be a PRC-wide entity because you are under government control. Having said that, they recognized that there was cooperation, so they did an average. If we were cooperative, which is what they explicitly found in this case, there is no basis whatsoever to use any part of an adverse rate. I mean, that's pretty clear from the case law. You can take a look at our brief I think in some detail on that. But there's no basis whatsoever if we were cooperative, if the PRC-wide entity was cooperative, meaning we were cooperative to do that. Commerce explicitly found that the PRC-wide entity had not failed to cooperate. So there's no basis for that. Why the 164.01% is adverse strikes me as rather strange. I mean, when they said it themselves, number one. Number two, even by averaging the two together with the .15 and the 164, I can tell you without any question that my client cannot export from China, that my client is bankrupt. So I can't really fathom why that is not an answer. Again, I would say, I would please, I would direct the court please to take a look at what Commerce specifically said about our lack of failure to cooperate as a PRC-wide entity and try to square that with the use of adverse rates in part or in whole. As to the question of what does the Commerce Department do when we say we're the only company which I think is really... Mr. Neely, I don't think you have further time. I'm sorry. Okay. Thank you, Your Honor. We will take this case under advisement and we will move on to the next one.